IN THE UNITED STATES DISTRICT COURT FOR
THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | CR NO. 2:17cr102-MHT-SRW |
| | ) | |
| KENDALL DEWIGHT SHINE | ) | |

## REPORT AND RECOMMENDATION

This matter is before the court on defendant's motion to suppress (Doc. 32) and first supplement (Doc. 36), the government's response (Doc. 39), the government's supplemental brief (Doc. 46), and defendant's second supplemental brief (Doc. 47). For the reasons set out below, the court concludes that the motion is due to be DENIED.

## I.    Facts

This case began with a traffic stop.[1] At approximately 4:00 p.m. on November 30, 2016, Montgomery Police Department Officer T.J. Ritchie and his partner for the day, Officer S.K. Pendley, were in a patrol car in the left turn lane of Wares Ferry Road when Ritchie first observed defendant in the parallel right lane. Ritchie testified that he had a clear and unobstructed view of defendant's Dodge Ram 1500 pickup truck as he saw defendant fail to use his turn signal prior to making a right turn from Wares Ferry Road onto Atlanta Highway. Ritchie did not follow immediately but, after approximately eight

---

[1] At the evidentiary hearing in this case, the government introduced video captured by Ritchie's dash camera relating to the traffic stop. (Gov. Ex. 1, "CD 3"). Exhibit 1 is in the form of a single DVD which contains several subfolders, with titles ranging from "CD 1" to "CD 4." The videos referenced in this Recommendation are identified by the titles of the subfolders in which they are found.

seconds, he made a right turn onto Atlanta Highway and proceeded to travel behind defendant.

Defendant made a right turn onto West Rosemary Road and then an immediate left turn[2] onto Blair Place, a road that runs parallel to Atlanta Highway. Ritchie testified that he observed defendant's brake lights activate as defendant made the left turn onto Blair Place, but defendant failed to use his turn signal prior to making the turn. Also, at some point after first observing defendant's vehicle and before initiating the stop, Ritchie used the "M.O.V.E"[3] computer system in his patrol car to search for information associated with defendant's license plate number. According to Ritchie, although defendant had a sticker on his license plate reflecting that his vehicle registration was current, Ritchie's search of the M.O.V.E. database showed that defendant's vehicle registration had expired on September 30, 2016. Ritchie testified that, based on defendant's twice failing to use a turn

---

[2] Ritchie testified that the distance between the turn onto West Rosemary Road and the subsequent turn onto Blair Place amounts to "approximately" one car length.

[3] Ritchie could not recall the words denoted by the acronym. According to Ritchie, the M.O.V.E. program allows sworn law enforcement officers to scan license plates and driver's licenses.

signal,[4] as well as defendant's expired registration,[5] he activated the lights and siren on his patrol car. Defendant stopped immediately.

Officer Pendley was the first to initiate contact with defendant. He approached the passenger side of the truck and began to speak with defendant. Pendley did not testify at

---

[4] At the evidentiary hearing, Ritchie testified that Ala. Code § 32-5A-134 requires the use of a turn signal; however, it is actually Ala. Code § 32-5A-133 that proscribes turning without first signaling. It provides:

**Turning movements and required signals.**

(a) No person shall turn a vehicle or move right or left upon a roadway unless and until such movement can be made with reasonable safety nor without giving an appropriate signal in the manner hereinafter provided.

(b) A signal of intention to turn right or left when required shall be given continuously during not less than the last 100 feet traveled by the vehicle before turning.

(c) No person shall stop or suddenly decrease the speed of a vehicle without first giving an appropriate signal in the manner provided herein to the driver of any vehicle immediately to the rear when there is opportunity to give such a signal.

(d) The signals provided for in Section 32-5A-134(b) shall not be flashed on one side only on a disabled vehicle, flashed as a courtesy or "do pass" signal to operators of other vehicles approaching from the rear, nor be flashed on one side only of a parked vehicle except as may be necessary for compliance with this section.

Ala. Code § 32-5A-133.

Ala. Code § 32-5A-134(a) describes the manner in which such signals shall be effected. It states, in pertinent part, that "[a]ny stop or turn signal when required herein shall be given either by means of the hand and arm or by signal lamps … ."

[5] Ritchie testified that Ala. Code §32-6-65(b)(1) governs registration of vehicles. It provides, in pertinent part:

It shall be the duty of all sheriffs, police officers, state troopers, license inspectors, deputy license inspectors, field agents of the Department of Revenue, and other law enforcement officers to arrest any person operating a motor vehicle without the current license plate displaying the proper tab, disc, or decal. Persons apprehended for operating a motor vehicle without the current license plate, upon conviction by a court of competent jurisdiction, shall be fined not less than twenty-five dollars ($25).

Ala. Code §32-6-65(b)(1).

the evidentiary hearing and Ritchie does not recall what Pendley said to defendant. Approximately 30 to 45 seconds after Pendley arrived at the passenger side door, Ritchie approached the driver's side of the truck. Ritchie testified that, as he approached the rear of the truck, he began to smell marijuana emanating from the vehicle. According to Ritchie, both the driver's side and passenger side windows were open and the marijuana odor was "strong enough for [him] to smell it" by the time he reached "somewhere between the rear of [defendant's] vehicle and the rear axle of [defendant's] vehicle."[6] Once Ritchie reached defendant's open window, he began to speak with defendant.

Video footage from Ritchie's dash camera shows Ritchie approaching the driver's side of the truck; however, it is impossible to hear his conversation with defendant. At the evidentiary hearing, the government also introduced two other videos. One appears to be generated by Ritchie's body camera (Gov. Ex. 1, "CD 2"); the second appears to be recorded by Pendley's body camera. (Gov. Ex. 1, "CD 1"). While Ritchie's body camera footage includes a portion of the conversation he had with defendant, the video from that camera does not start until approximately one minute into the conversation;[7] therefore,

---

[6] Ritchie testified that when he was in the police academy, he received training on narcotics and that he has also taken a narcotics class "put on by the Drug Enforcement Administration." Ritchie also testified that he has had experience in handling narcotics and drug paraphernalia. He indicated that he is familiar with the odor of marijuana.

[7] During the evidentiary hearing, the government made several references to specific points in the video footage that it introduced. In doing so, the government sometimes referenced the time that had elapsed from the start of a video, as opposed to the actual time. The court reviewed the video footage introduced as government's exhibit 1 exhibit. In the "Flashback Player 3.9.2.0 application," all video footage is logged in military (24-hour clock) time, as opposed to elapsed time; therefore, in referring to video footage, the court will use time notations reflecting military time in the following format – hour: minute: second.

there is no recording containing discernable audio of roughly the first minute of Ritchie's conversation with defendant.[8]

Ritchie testified that he began his interaction with defendant by asking him if he had valid registration for the vehicle. Ritchie's dash camera footage starts in the middle of this conversation about registration, with Ritchie asking, "So what's wrong with your tag? – it's expired." Ritchie then told defendant that there was "a 17 sticker on [the license plate], but it expired last year. So, nobody has your sticker. If anybody did anything to a sticker, it was put that on the tag." It is difficult to hear defendant's response to Ritchie, but Ritchie replied, "It's not – That's what I'm saying – it's not good. Do you have the registration that proves as such?" Immediately after Ritchie asked this question, Pendley left the passenger's side and walked to the driver's side to speak with Ritchie. None of the three videos from the stop captures the audio of the conversation between Pendley and Ritchie, which lasted only seconds.[9] Ritchie testified that when Pendley approached him, Pendley

---

"CD 4" contains only audio footage and, unlike the video footage, does not have a date or time stamp. Therefore, in discussing specific points in the audio footage, the court will refer to the time elapsed in the following format – minute: second.

[8] The dash camera footage (Gov. Ex. 1, "CD 3") shows that at 16:03:30, Ritchie emerged from the patrol car and began to approach the driver's side of defendant's truck. By 16:03:35, Ritchie was standing in front of the driver's side window. Ritchie's body camera footage (Gov. Ex. 1, "CD 2") begins at 16:04:30, nearly a minute after he first arrived at the window. Pendley's body camera footage (Gov. Ex. 1, "CD 1") does not begin until 16:16:31, when the stop was well underway.

[9] The dash camera shows that at the 16:05:11 mark, Pendley backed away from the passenger side of the truck. By the 16:05:24 mark, Pendley had moved to the driver's side. The dash camera does not capture the audio from this conversation. Ritchie's body camera video reflects the same – at the 16:05:11 mark, it is possible to see Pendley in defendant's truck's rear view mirror as the officer backs away from the passenger's side of the truck. By the 16:05:24 mark, a reflection of Pendley is visible on the driver's side of defendant's truck; however, there is no discernable audio of the conversation. Pendley's body camera video does not begin until 16:16:31, which was nearly 10 minutes after the conversation occurred.

told him that when defendant opened his center console to look for registration documents, Pendley saw a digital scale in the center console. Pendley then returned to the patrol car.

According to Ritchie, based on the odor of marijuana and Pendley's report of a digital scale, he began to suspect that defendant was involved in the distribution of narcotics. Ritchie testified that based on his training and experience in more than 50 narcotics cases, scales and drugs "go hand in hand" and a digital scale can represent drug paraphernalia.

Ritchie then resumed his questioning regarding the registration, asking, "When does that say that it expired?" While defendant was looking for something in his car, Ritchie said, "A Wal-Mart receipt don't have nothing to do with a traffic stop."  While defendant continued to look in his car, Ritchie said, "Go ahead and take your wallet and your phone out of your lap – you hear me? – take your wallet and your phone out of your lap and take everything out of your hands.  Do you have anything on you I need to know about before I get you out of this vehicle – anything at all? … Whenever I get you out, your hands are going to be far enough away from your body to where they can touch that windshield and you're going to step into the back of the door, you understand? … The crack of the door – I am going to open the door and you're going to go right into the crack of it, you understand? No more movements other than that, okay? Are we clear?" Ritchie opened the driver's side door and asked defendant to step out and touch the windshield. Defendant complied. Ritchie asked defendant again if he had anything "on him" that Ritchie needed "to know about" and warned defendant that this was his "last chance." Ritchie then asked defendant, "No? Why do you have a scale in your center console – huh?" Ritchie's body

camera did not capture clear audio of defendant's response. Ritchie then asked, "What's all this? What's all this?" Ritchie told defendant to place his hands behind his back and said, "Right now, you are not under arrest – you are just being detained, okay?" At the 16:07:05 mark, Ritchie handcuffed defendant.

Ritchie testified that he handcuffed defendant for "officer safety," specifically because of the following factors: (1) the location of the traffic stop, which was "next to probably one of the busiest roads in the city" and near "residences … that [defendant] could flee to"; (2) the defendant's "physical stature," as defendant is "bigger, taller than [he and Pendley]," and defendant is heavier than [Ritchie] in weight"; (3) the fact that he and Pendley were "always separated" and, at this particular time, Pendley was "back in the patrol car" "running [defendant's] driver's license and some other documents pertaining to the traffic stop"; and (4) the presence of the odor of marijuana and the digital scale because, in Ritchie's experience with prior drug cases, "subjects have tried to fight and/or flee from apprehension."

After handcuffing defendant, Ritchie asked defendant, "Anything on you that I need to know about before I find it?" Defendant responded, "I don't have anything on me." Ritchie asked, "Do you care if I take a look inside your pockets?" Ritchie's body camera does not fully capture the audio of defendant's response, but it appears to have been in the affirmative. Ritchie then said, "You don't care? Step back here for me … Lean up against the vehicle for me. Spread your feet – keep going, keep going." After this, Ritchie proceeded to search defendant's pockets. While searching, Ritchie asked defendant

questions about the contents of his pockets[10] and then asked, "What about the scale in your center console, man?"  Again, it is difficult to hear defendant's response. Ritchie then said, "That's drug paraphernalia, bud … is it not?" Ritchie repeated the question and said, "Yeah – step back here for me – have a seat on this bumper right here." Defendant, who was handcuffed with this hands behind his back, sat on the hood/brush guard of the patrol car.[11] Pendley remained with defendant. According to Ritchie, defendant was not free to leave at this point.

At 16:08:35, Ritchie began searching the vehicle with a flashlight. Ritchie testified that he conducted a search of the vehicle based on "the odor of marijuana emitting from the vehicle," and said that the purpose of the search was to find marijuana "anywhere marijuana could be found." Due to the position of the body camera, it does not capture exactly what Ritchie sees as he looks in the vehicle. However, Ritchie testified that he put his hands under the seats and looked in all the compartments – *i.e.*, "the driver door, the ashtray on the dash, and the center console." It is clear that at the 16:09:54 mark, Ritchie found a black handgun. Ritchie testified that he discovered the loaded Smith & Wesson revolver "underneath the driver's seat of the defendant's vehicle." A photograph of the revolver was introduced into evidence as government's exhibit 2.

After finding the handgun, Ritchie called out to defendant, "Hey, you got a weapons permit?" Defendant's response is unclear. Ritchie asked the question again and, while it is

---

[10] Defendant had cigarettes and a contraceptive in his pocket.

[11] This occurred at the 16:03:32 mark.

difficult to hear the response, defendant shook his head, indicating a negative response. Ritchie asked, "How many times did I ask you if there was anything in the vehicle you needed me to know about?" Defendant responded, "You asked if there was anything on *me*." Ritchie and Pendley proceeded to argue with defendant about whether Ritchie had asked defendant if there were contraband in his vehicle. Ritchie then asked defendant, "Do you have a weapons permit – a pistol permit?" Defendant shook his head to indicate, "no." (Gov. Ex. 1, "CD 2" at 16:11:22).[12] Ritchie testified that defendant still was not under arrest at this point, but that he was committed to keeping defendant in custody. Ritchie said to defendant, "Then there is no reason why that needs to be in the vehicle in such a manner. Are you a convicted felon?" Defendant responded, "Yeah." (Gov. Ex. 1, "CD 2" at 16:11:27).[13] Ritchie testified that defendant also was not under arrest at this point because

---

[12] Ritchie testified that, under Ala. Code § 13A-11-73, it is illegal for someone to carry a pistol without a permit. The statute states:

> (a)  Except on land under his or her control or in his or her own abode or his or her own fixed place of business, no person shall carry a pistol in any vehicle or concealed on or about his or her person without a permit issued under Section 13A-11-75(a)(1) or recognized under Section 13A-11-85.

> (b)  Except as otherwise prohibited by law, a person legally permitted to possess a pistol, but who does not possess a valid concealed weapon permit, may possess an unloaded pistol in his or her motor vehicle if the pistol is locked in a compartment or container that is in or affixed securely to the vehicle and out of reach of the driver and any passenger in the vehicle.

Ala. Code § 13A-11-73(a-b).

[13] Ritchie testified that Ala. Code § 11-32-72 makes it illegal for a convicted felon to possess a firearm. The statute states, in pertinent part:

> (a)  No person who has been convicted in this state or elsewhere of committing or attempting to commit a crime of violence, misdemeanor offense of domestic violence, violent offense as listed in Section 12-25-32(15), anyone who is subject to a valid

he was still "trying to gather all the information" and that there were people he needed to contact "in reference to furtherance of the case." Ritchie further testified that up until this time, he had no "basis for charging defendant with carrying a pistol without a permit or being a felon in possession of a firearm." All of his previous questions, Ritchie testified, were directed to the defendant in an attempt "to either confirm or dispel the suspicion involving a gun."[14]

Ritchie then said, "That poses another problem." Defendant replied, "It's hard times, officer." Ritchie replied, "It might be, but I got a normal job – right? I mean, do you bang or something – why do you feel like you need to carry a gun for?" Defendant responded, "For protection." Ritchie asked, "Who are you protecting yourself from?" Defendant reiterated that the gun was for "protection." Ritchie then asked, "You sling dope?" Defendant said, "No, but it's a cold world … ," to which Ritchie responded, "It might be, but – are you kicking it with people you don't need to be kicking it with or something?" Defendant said, "It's rough where I stay at." Defendant described where he lives, to which Ritchie replied, "I'm not giving you a hard time because of it, but for the simple fact that if you want to carry it, that's fine, but if somebody asks – especially me – if you have anything in the vehicle I need to know about – right? – guns, weapons, bombs, explosives,

---

protection order for domestic abuse, or anyone of unsound mind shall own a firearm or have one in his or her possession or under his or her control.

Ala. Code § 13A-11-72(a).

[14] At the evidentiary hearing, counsel for the government stated that the government does not intend to offer as evidence any statements made by the defendant after he responded, "yeah" to the question of whether he is a convicted felon.

small children that you're hiding – you get what I'm saying? – stuff like that – that poses a very big problem for somebody that's in the situation that I'm in, right? You're reaching under the seat – what are you reaching under the seat for? – I'm not saying that you were, right, but if you were and I didn't know that it was there, then what? You get what I'm saying? You gotta understand why I'm coming from – that's the reason why we ask, ok?" Defendant then asked Ritchie to "please understand" where he was "coming from." Ritchie sked defendant if he had "anything else in the vehicle whatsoever" that he needed to know about. Defendant responded, "No. That's it." Ritchie then returned to defendant's vehicle and searched it with the flashlight again. (Gov. Ex. 1, "CD 2" at 16:13:04).

At the 16:13:58 mark, Ritchie closed the driver's side door and began walking back toward the patrol car, where defendant was still sitting, handcuffed. Defendant said to Ritchie: "I don't see why my tag ain't showing up, though." Ritchie responded, "Stay right there." Ritchie got into the driver's seat of the patrol car. (Gov. Ex. 1, "CD 2" at 16:14:14). After about 45 seconds, Ritchie emerged and approached defendant, who was still sitting on the brush guard of the patrol car. He said to defendant, "Remember how you said to understand where you're coming from? The only thing you've ever got convicted of is drugs. You sell drugs – that's fine. Right? I'm not – I don't – It don't make me feel some type of way about you, right? At the end of the day, I've got a job to do. You're telling me it's so rough out here, it's probably so rough out here because you probably sling dope for a living, yeah? Or used to or something?" Defendant responded, "Yeah, I used to." Ritchie then said, "Ok, so, whether it be used to or now, I understand how the game works. People never forget stuff like that. Okay? I get that. But, I have a job to do at the same time, right?

Just like you have a job to do – or had a job to do, right? It's all about respect. You've shown me respect – I've shown you respect, right? That's the name of the game – I get that. No matter what you do – It's about respect." Ritchie then asked, "Is the gun stolen?" Defendant responded, "No, it's not stolen." Ritchie asked where defendant got the gun. Defendant responded that it was not stolen.

Ritchie asked defendant if he was "pulling into the house right here." Ritchie may have gestured toward a house on what appears to be a residential street running parallel to Atlanta Highway, but the body camera did not capture it. Defendant responded that he had pulled over to check his text messages. Ritchie then asked defendant if he knew "somebody that lives here." Defendant said he did not. Ritchie said, "So you don't smoke dope – you snort powder?" Defendant said he did not, to which Ritchie replied, "Don't lie to me. Why do you have a razor blade on your scale with white residue on it?" Defendant responded, "Because I grind it up." Ritchie replied, "Why is there white on your scale then? Don't sit here and play me for a fool, man. If you use powder, you use powder, right? What does that say? That says you use powder, don't it? Don't lie to me man. Right?" Defendant shook his head affirmatively and said, "right." Ritchie continued to question defendant about his drug use and whether defendant had anything on his person. Ritchie said to defendant, "Be truthful with me. The reason why I ask questions is because I know the answers. Nobody uses a fucking razor blade to do marijuana on a scale with. "Do you have anything in your waist, or in your balls, or in your ass or anything like that?" Defendant responded, "I […] came clean with you." Ritchie replied, "No, you didn't. Do you have anything on you whatsoever – because if I take you down to S.O.D., and you have

something in there, it's going to be a bad day." Defendant responded, "Nah, you ain't going to take me to S.O.D., is you?" Ritchie then replied, "I could." Defendant reaffirmed he did not have anything on his person.

Ritchie then told defendant to "have a seat" in the back of the patrol car. (Gov. Ex. 1, "CD 2" at 16:18:16). Defendant sat down and, while the door was open, Ritchie questioned him about where he bought his drugs. At the 16:19:34 mark, Ritchie said, "You're not under arrest. You're just hanging out back here for right now." Defendant reiterated that his tag was "supposed to be right," to which Ritchie responded, "It's not. It's showing that you don't have insurance either, do you?" Defendant said, "He has the insurance payment. You can't get a tag without insurance." Ritchie acknowledged that was true and then said, "It's still showing [it's] expired – I'll show you. Put your feet in and I'll show you on the computer."

During this exchange, Pendley was standing near the passenger side door of the patrol car. Pendley's body camera (Gov. Ex. 1, "CD 1") captures a telephone conversation between Pendley and an unknown person whom the court presumes is employed by the Montgomery Police Department. At the 16:17:42 mark, Pendley began speaking on the telephone. The court cannot make out what the other person said in response to Pendley, but Pendley's statements to him or her are clear: "Hey –uh – do you have Ioimo's number? … with the ATF task force or whatever?  What's his number? Okay, I've got a dude out here stopped and he's got a Smith and Wesson .44 mag up under his seat – uh, he's got a bunch of trafficking charges. He's got guilty pleas for trafficking and possession of marijuana. Do you think they'll want to talk to him?  Uh, he's got trafficking, marijuana

… he's just got like drug trafficking stuff and stuff about dog violence, so I guess he was fighting dogs. All he's got is this gun and a scale. His car reeks of weed, but he said he was smoking it this morning. But, I think he's probably selling, too. Who knows. Oh well, text me his number. Is he working today?  …  If not, we'll probably just hook him up with certain persons forbidden – no, not certain persons forbidden – violation of license to carry. …  All right, bye."

At the 16:20:01 mark, Ritchie closed the door to the patrol car. Ritchie and Pendley, who were standing outside the patrol car, had a conversation about whether they were allowed to show defendant their computer system. They also discussed how to determine whether the car was stolen or had been used in the commission of any crimes. Pendley said to Ritchie, "I'm getting Privett to text me Ioimo's number to see if maybe they want to do anything with it." (Gov. Ex. 1, "CD 1" at 16:20:17). Ritchie then got back into the patrol car and moved it forward because it was blocking in a nearby resident's vehicle.  He began to ask more questions about the vehicle registration and asked defendant if he wanted Ritchie to "go look for" the registration purchase receipt in the vehicle. Ritchie then searched the vehicle again. Ritchie's body camera video ends after this search. (Gov. Ex. 1, "CD 2" at 16:27:17). At the 16:28:17 mark, Pendley, who was still standing outside the patrol car, called someone else. (Gov. Ex. 1, "CD 1" at 16:28:17). Again, the court cannot hear the person on the other line, but can hear Pendley. He said, "Hey, you got Ioimo's number with ATF Task Force or whatever? Okay. We stopped this car over here on Atlanta … driver had … he's got some convictions like trafficking and stuff like that – guilty pleas – and he had a .44 magnum sitting up under his seat. Car smelled of weed, so we pulled

him out and that's when we found it. He's got a scale sitting in his console that has like a little bit of, like, cocaine residue on it. We were just going to see if he wanted to maybe talk to him. Uh, do you think they'd charge him with certain person[s]?"[15]

The dash camera (Gov. Ex. 1, "CD 3") captures video until the 16:41:54 mark. Ritchie testified that defendant never produced proof of valid registration. There is no testimony regarding when defendant was formally placed under arrest.

At approximately 6:10 p.m. that evening, Montgomery Police Department and ATF task force officer Jeffrey Ioimo interviewed defendant.[16,17] Officer Ioimo testified that before he interviewed defendant, he received information from the "other officers" concerning the "basic facts of where [the traffic stop] took place, what [the officers] located, [and] why [the officers] stopped him." Prior to asking questions of defendant, Ioimo advised him of his *Miranda*[18] rights and presented him with a written waiver form. According to Ioimo, he told defendant that if he were willing to speak, he should read and

---

[15] Pendley's body camera did not capture any footage after this question.

[16] The government audio from the interview into evidence. (Gov. Ex. 1, "CD 4). Ioimo testified that the interview began at approximately 6:00 p.m. In the audio recording, Ioimo states that the interview began at "approximately 18:10:00."

[17] Ioimo testified that Detective J.O. Williams was also in the room during the recitation of defendant's rights, but Williams left during the interview. The audio recording captures someone stating that they are leaving. This statement is made at the 05:00 mark, immediately following defendant's execution of the waiver of rights form. The court assumes, based on Ioimo's testimony, that this was Detective Williams.

[18] *Miranda v. Arizona*, 384 U.S. 436 (1966).

sign it. Ioimo testified that defendant showed no signs of having difficulty understanding his instructions or the form. Defendant executed the waiver form.[19]

After a number of preliminary questions, Ioimo asked defendant several questions about the events of the day. Ioimo asked, "What's going on tonight?" (Gov. Ex. 1, "CD 4" at 6:10). Defendant responded, "They was saying, like … my tag didn't register. But, I know it's a valid tag. That's basically about it." Ioimo then asked, "Then what else happened, though? I mean, clearly some other stuff – if that was the only thing …   ." Defendant replied, "Nah, I mean, they got my gun out [sic] the car." (Gov. Ex. 1, "CD 4" at 6:32). Ioimo then asked, "Have you ever been convicted of a felony before?"  (Gov. Ex. 1, "CD 4" at 6:58).  Defendant responded, "Yeah, I have."

Ioimo also asked defendant about the scale and his drug use. Approximately halfway into the interview, Ioimo said to defendant, "Let me ask you about that scale in the car. I mean, do you personally use?" (Gov. Ex. 1, "CD 4" at 10:32). Defendant responded that the scale is for personal use. Ioimo then said, "Cocaine, I'm assuming, with the razor blade and the …   ." Defendant told Ioimo that he did not want to talk about it. Ioimo also asked defendant if he "smoke[s] weed." (Gov. Ex. 1, "CD 4" at 11:27). Defendant responded affirmatively, which prompted Ioimo to ask, "When is the last time you smoked in the car?" (Gov. Ex. 1, "CD 4" at 11:30). Defendant replied, "[T]his morning." At the

---

[19] The government introduced into evidence the waiver of rights form that defendant signed. (Gov. Ex. 3). The government also introduced into evidence an audio recording of the custodial interview. (Gov. Ex. 1, "CD 4).

evidentiary hearing, Ioimo testified he does not recall "hear[ing] [this] from the other officers."

Ioimo also asked defendant about the expired tag. He said, "Let me ask you about the tag because the officers mentioned that they observed you making a turn without a turn signal and they also said that there was also a – I'm just telling you what I was advised of – they also mentioned … the expired ta[g]." (Gov. Ex. 1, "CD 4" at 18:57). In response, defendant maintained that the registration was current.

Additionally, after defendant stated that he had looked for his registration and insurance[20] in the vehicle, Ioimo asked, "Let me ask you this – where was that scale at in relation – in the car – was it where your insurance was, or where your registration should have been?" (Gov. Ex. 1, "CD 4" at 20:34). Defendant responded that it was in the "middle part" and confirmed that he opened the center console when looking for his registration. Ioimo then asked, "[A]nd that's when the officer saw it?"  Defendant responded, "yeah."

Though Ioimo did not testify regarding whether defendant was handcuffed during this interview, at the beginning of the interview, Ioimo asked defendant if he were right-handed or left-handed, and it is possible to hear the jingling of a chain in the background. Furthermore, Ioimo had a discussion with defendant at the conclusion of the interview regarding his handcuffs. (Gov. Ex. 1, "CD 4" at 24:24-25:24). The audio from this

---

[20] There does not appear to be a dispute regarding whether defendant provided proof of insurance.

conversation supports a conclusion that defendant's handcuffs were removed during the interview and replaced when it was over.[21]

No testimony was presented to the court regarding when exactly the officers realized that defendant's registration was, in fact, current, and that the M.O.V.E. system had provided them with incorrect information. However, it is undisputed that at the time of the traffic stop, defendant's vehicle's registration actually was valid.[22]

Finally, although there is no testimony of record to this effect, defendant asserts in his motion to suppress that while he was arrested on November 30, 2016, Ritchie did not actually issue a traffic ticket for failure to use a turn signal until December 5, 2016 – five days after the traffic stop and arrest. The government's briefs are silent on this point.

The instant indictment followed.[23]

## II.   Discussion

Defendant raises several issues in his motion to suppress. The court addresses each in turn.

---

[21] At the conclusion of the interview, the recorder picks up the sound of metal clinking. Ioimo says to defendant, "Other arm?" and then, "I've gotta put them behind." Defendant asks Ioimo to put "them in the front," and Ioimo responds, "No sir. Like I said … if the supervisors – if they saw me walking you with them in the front – now, I can keep 'em loose. But, I can't – per policy – put them in the front. Now, if you're pregnant, sometimes they'll let us do that, but outside of that … ."

[22] *See* Doc. 39 at p.6 (in which the government refers to the officers' "mistake of fact" that the registration was not current).

[23] Defendant is charged with possession of a firearm by one previously convicted of a felony (Felon in Possession of a Firearm, in the United States District Court for the Middle District of Alabama, case number 2:04-cr-00032-MHT-SRW-1; Unlawful Distribution of a Controlled Substance, in the Circuit Court of Montgomery County, Alabama, case number CC-2004-000227; and Trafficking Cocaine, in the Circuit Court of Montgomery County, Alabama, case number CC-2002-00658), in violation of Title 18, United States Code, Section 922(g)(1)). (Doc. 1).

A.      **Did Officers Ritchie and Pendley have reasonable suspicion to initiate the traffic stop?**

Defendant contends that Officers Ritchie and Pendley lacked reasonable suspicion to justify the traffic stop in this case. Defendant argues that, as a result, "all physical and testimonial items and information obtained" should be suppressed. (Doc. 32 at 7). The government argues that the officers had reasonable suspicion to initiate the stop because defendant made two turns without a using a turn signal. The government also maintains that the officers' mistaken belief that defendant was driving a car with an expired registration provided reasonable suspicion sufficient to make the stop.

The Fourth Amendment prohibits unreasonable searches and seizures. U.S. Const. Amend. 4. It is well settled that "[a] traffic stop for a suspected violation of law is a 'seizure' of the occupants of the vehicle and therefore must be conducted in accordance with the Fourth Amendment." *Heien v. North Carolina*, __ U.S. __, 135 S.Ct. 530, 536, 190 L.Ed.2d 475 (2014). "As a general proposition, a traffic stop comports with the Fourth Amendment 'where the police have probable cause to believe a traffic violation has occurred.'" *United States v. Lopez*, 2017 WL 373454, *4 (S.D. Ala. Jan. 25, 2017) (quoting *Whren v. United States*, 517 U.S. 806, 810 (1996)). *See also United States v. Cooper*, 133 F.3d 1394, 1398 (11th Cir. 1998)("[L]aw enforcement may stop a vehicle when there is probable cause to believe the driver is violating any one of the multitude of applicable traffic and equipment regulations relating to the operation of motor vehicles.")(quotation marks omitted). "Probable cause requires that the 'facts and circumstances within [an officer's] knowledge and of which [the officer] ha[s] reasonably trustworthy information

[be] sufficient to warrant a prudent man in believing' that the person seized" has committed a traffic violation. *United States v. House*, 684 F.3d 1173, 1199 (11th Cir. 2012)(quoting *Beck v. Ohio*, 379 U.S. 89, 91)(1964)). "For example, [the Eleventh Circuit] ha[s] held that an officer has probable cause to initiate a traffic stop when he or she observes a traffic violation. *United States v. Harris*, 526 F.3d 1334, 1338 (11th Cir. 2008)(holding that an officer had probable cause to stop a vehicle after observing that it failed to signal a lane change))." *United States v. Blackmon*, 536 F. App'x. 944, 946 (11th Cir. 2013)(per curiam)(unpublished).

The record reflects that Officers Ritchie and Pendley initiated a traffic stop of the defendants' vehicle after they personally observed the defendant turn twice without first activating his turn signal. As noted above, Ala. Code § 32-5A-133(a) (1975) states that drivers can turn only after "giving an appropriate signal." Due to the position of the patrol car in relation to defendant's car at the time defendant turned from Wares Ferry Road onto Atlanta Highway, there is no video evidence of defendant's first alleged failure to use his turn signal. However, in light of Ritchie's testimony regarding his eyewitness observation, which the court finds credible[24] – and the fact that defendant offers no evidence to

---

[24] Defendant does not contest the credibility of Ritchie's testimony on the stand. The court finds that testimony credible. "Credibility determinations are typically the province of the fact finder because the fact finder personally observes the testimony and is thus in a better position than a reviewing court to assess the credibility of witnesses." *United States v. Ramirez-Chilel*, 289 F.3d 744, 749 (11th Cir. 2002). "'In weighing the credibility of a witness, the court takes 'into account the interests of the witnesses, the consistencies or inconsistencies in their testimonies, and their demeanor on the stand.' [*Ramirez-Chilel*, 289 F.3d at 749]; *see also United States v. Wein*, 2006 WL 2128155, at *3 (W.D. Pa. July 27, 2006)(noting that 'customary techniques to ascertain the credibility of the witnesses' included, but [were] 'not limited to: appearance and conduct of each witness, the manner in which he testified, the character of the testimony given, his intelligence, motive, state of mind, and demeanor while on the stand.')." *United States v. Brounson*, 2016 WL 4472983, *4 (N.D. Ga. May 23, 2016). Moreover, "unless the evidence is contrary to the laws of nature, or is so inconsistent or improbable on its face that no reasonable factfinder could accept

controvert Ritchie's testimony – this court concludes that a reasonable officer in Ritchie's position could have stopped the defendant's vehicle for defendant's failure to use his turn signal before turning right from Wares Ferry Road onto Atlanta Highway. As to defendant's left turn onto Blair Place, there is video evidence of defendant's second failure to use his turn signal. Defendant argues in his motion to suppress that the video is "inconclusive" (Doc. 36 at p. 2); however, the court has carefully reviewed the dash camera video (Gov. Ex. 1, "CD 3" at 16:01:57-16:02:24), and it cannot agree. While defendant's tail lights are on and defendant appears to tap his brakes, there is no footage supporting a conclusion that defendant activated his left turn signal prior to turning left from West Rosemary Road onto Blair Place. Thus, the video supports Ritchie's testimony – which, again, this court finds credible – that defendant also failed to activate his turn signal prior to turning left onto Blair Place.[25] Accordingly, the traffic stop was constitutionally justified at its outset.

---

it or unless the factfinder's determinations appear to be unbelievable, a reviewing court should accept those findings of fact." *Id.* (quoting *Ramirez-Chilel*, 289 F.3d at 749)(internal quotation marks and alterations omitted). This court has evaluated Ritchie's testimony based on the above instructions and has found it to be credible.

[25] Even if the video footage of the second failure to signal were, as defendant argues, inconclusive, given Ritchie's credible testimony and the fact that the video does not controvert his testimony, the court would still find there is sufficient evidence to support the existence of probable cause to stop the vehicle for this second traffic violation. *See United States v. Gonzalez*, 2009 WL 2432732 (M.D. Ala. Aug. 7, 2009)(in spite of what defendant argued was unclear video evidence, holding that in light of the video and the officer's testimony regarding what he personally saw, there was sufficient evidence to support the existence of probable cause to stop vehicle for committing traffic violation); *Ramos*, 2017 WL 26905 at *3 (despite "inconclusive" video evidence, holding that based on the officer's credible testimony about his eyewitness account, the magistrate judge correctly concluded that there existed probable cause to stop defendant for committing traffic violation).

The court does not reach the question of whether there was probable cause to stop the vehicle for what the officers mistakenly – but apparently in good faith – believed to be a tag violation, as it has already determined that probable cause existed based on the turn signal violations.

**B.  Did Officers Ritchie and Pendley have probable cause to search defendant's vehicle?**

Defendant argues that Ritchie and Pendley lacked probable cause to believe that contraband or evidence of a crime would be found in defendant's vehicle. The government responds that because Ritchie detected the odor of marijuana emanating from the open window of defendant's vehicle, he had probable cause to conduct a search of the vehicle.

"A warrantless search of an automobile is constitutional if (1) the automobile is readily mobile and (2) there is probable cause to believe that it contains contraband or evidence of a crime." *United States v. Smith*, 596 F. App'x. 804, 807 (11th Cir. 2015)(citing *United States v. Lanzon*, 639 F.3d 1293, 1299-1300 (11ᵗʰ Cir. 2011)). "The first prong is satisfied if the car is operational[.]" *Id.* (citing *United States v. Watts*, 329 F.3d 1282, 1286 (11th Cir. 2003)). In this case, it is undisputed that the vehicle was operational. "Regarding the second prong, probable cause exists when, under the totality of the circumstances, there is a fair probability that contraband or evidence of a crime will be found in the vehicle." *Id.* (citing *Lanzon*, 639 F.3d at 1300). "Probable cause may arise when an officer, though training or experience, detects the smell of marijuana." *Id.* (citing *United States v. Tobin*, 923 F.2d 1506, 1512)(11th Cir. 1991)(*en banc*); *United States v. Lueck*, 678 F.2d 895, 903

(11th Cir. 1982)(noting that it is "clearly established that the recognizable smell of marijuana gives rise to probable cause supporting a warrantless search.").

At the evidentiary hearing, Ritchie testified that, based on his training and experience, he recognized the odor of marijuana coming from inside the vehicle through the open driver's and passenger's side windows. This training and experience included working on over 50 cases involving marijuana, receiving training on narcotics, and handling narcotics and drug paraphernalia during the course of his duties. He further testified that he is familiar with the odor of marijuana. Defendant does not contest the credibility of this testimony and the court finds it credible. *Ramirez-Chilel*, 289 F.3d at 749. Because Ritchie detected the odor of marijuana coming from the vehicle, he had probable cause to conduct a warrantless search of the vehicle. *See Lanzon*, 639 F.3d at 1300; *Tobin*, 923 F.2d at 1512; *Lueck*, 678 F.2d at 903. "As the Supreme Court has explained, 'If there is probable cause to believe a vehicle contains evidence of criminal activity, [the Court's case law] authorizes a search of any area of the vehicle in which the evidence might be found.'" *Smith*, 596 F. App'x at 807. (quoting *Arizona v. Gant*, 556 U.S. 332, 347)(2009)(brackets in original). Therefore, the search of the vehicle did not run afoul of the Fourth Amendment.

### C.   Did Officers Ritchie and Pendley conduct a custodial interrogation without first advising defendant of his *Miranda* rights?

Defendant argues that from the moment he was told to exit his vehicle, he was in custody for purposes of *Miranda,* and that because he was not first advised of his *Miranda* rights, any statements he made from that point forward should be suppressed. The

government responds that it does not intend to offer as evidence any statements made *after* defendant admitted he is a convicted felon. (Doc. 39 at p. 3).[26] It argues further that, with respect to the time leading up to defendant's statement that he is convicted felon, defendant was not in custody. The government admits that defendant was handcuffed shortly after being asked to step out of his car, but maintains that this measure was taken "due to concerns of flight risk and officer safety" and did not amount to placing defendant in custody. (Doc. 39 at p. 2). Therefore, the government contends, Ritchie and Pendley were not required to advise defendant of his *Miranda* rights prior to asking questions of him, and defendant's answers to the questions asked during the relevant period are not due to be suppressed.

The court must first address whether defendant was in custody during the pertinent time frame – *i.e.*, from the point defendant was directed to step out of the vehicle until he responded, "yeah" to Ritchie's question regarding whether or not he was a convicted felon. Under *Miranda*, "evidence obtained as a result of a custodial interrogation is inadmissible unless the defendant had first been warned of his rights and knowingly waived those rights." *United States v. Crawford*, 294 F. App'x 466, 473 (11th Cir. 2008). "The requirement that an individual receive *Miranda* warnings before answering questions applies only when the individual is in custody." *Id.* (citing *United Sates v. Torkington*, 874 F.2d 1441, 1445 (11th Cir. 1989)). "If a motorist who has been detained pursuant to a traffic

---

[26] While the government's response to the motion to suppress is not entirely clear on this point, at the evidentiary hearing, counsel for the government explained, "[T]he government only intends to use the statements up until the seven-minute mark. That's after Ritchie asks the defendant, 'Are you a convicted felon,' and his answer is 'yeah.' … And after that, the government does not intend to use – the other roadside statements."

stop thereafter is subjected to treatment that renders him 'in custody' for practical purposes, he [or she] will be entitled to the full panoply of protections prescribed by *Miranda*." *Berkemer v, McCarty*, 468 U.S. 420, 440 (1984). "In determining whether a person was in custody, we look to whether he [or she] was physically deprived of his freedom in any significant way or if a reasonable person in the defendant's position would have understood that his freedom was so restrained." *United States v. Lall*, 607 F.3d 1277, 1284 (11th Cir. 2010). In other words, "a stopped motorist is considered 'in custody' if he [or she] is subjected to treatment during the traffic stop that amounts to a restriction of freedom associated with a formal arrest." *United States v. Crawford*, 294 F. App'x at 474. "In [*United States v.*] *Street*, [472 F.3d 1298, 1309 (11th Cir. 2006)], the Eleventh Circuit explained that the definition of 'custody' for *Miranda* purposes is not co-extensive with the definition of 'seizure' for Fourth Amendment purposes." *United States v. Perry*, 2012 WL 601892, *9 (N.D. Ga. Jan. 19, 2012), *adopted by* 2012 WL 601890 (N.D. Ga. Feb. 23, 2012), *affirmed by* 522 F. App'x 821 (11th Cir. 2013). The *Street* court wrote:

> [A] seizure does not necessarily constitute custody for Miranda purposes. The standards are different. The Fourth Amendment seizure analysis uses the "free to leave" test: a person is seized when a reasonable person would not feel free to terminate the encounter with the police. By contrast, a person is in "custody" for Miranda purposes only when there is a formal arrest or restraint on freedom of movement of the degree associated with a formal arrest.

*Street*, 472 F.3d at 1309-10 (internal citations and quotation marks omitted).

> The court in *Street* explained further that the test for whether a person is "in custody" is a "totality of the circumstances determination," and it is objective, as viewed from the perspective of "a reasonable innocent person." [Street] at 1309. Thus, "'the actual, subjective beliefs of the defendant and the interviewing officer on whether the defendant was free to leave are

irrelevant.'" *Id.* (quoting *United States v. Moya*, 74 F.3d 1117, 1119 (11th Cir. 1996)). When applying this test, the court should consider several factors, "including whether 'the officers brandished weapons, touched the suspect, or used language or a tone that indicated that compliance with the officers could be compelled.'" *Street*, 472 F.3d at 1309 (quoting *United States v. Long*, 866 F.2d 402, 405 (11th Cir. 1989)).

*Perry* at *10.

In this case, it is undisputed that during the relevant period – that is, from the time defendant exited his truck until he responded affirmatively to Ritchie's question regarding whether he was a convicted felon – neither officer advised defendant of his *Miranda* rights before defendant made statements. However, the court finds that defendant was not yet in custody at this time. Defendant was not told he was under arrest – in fact, he was expressly told that he was *not* under arrest. *See United States v. Fields*, 178 F. App'x 890, 894 (11th Cir. 2006)("[A]ny belief by [defendant] that he was being arrested would have been dispelled by [the officer] repeatedly informing [defendant] that he was not under arrest); *Perry*, 2012 WL 601892 at *10 (finding it relevant that defendant "was not … told that he was placed under arrest when the [officers] spoke with him prior to the search of the [vehicle] or when they questioned him about the firearm found during the search[.]"). There is also no indication in the record that either officer drew his weapon, much less pointed it toward defendant. Furthermore, the court has carefully reviewed the three videos of the subject encounter, and it cannot conclude that, during this portion of the stop, either officer "used language or a tone that indicated that compliance with the officer could be compelled." *Perry* at *10. The officers were direct in their questioning of defendant, but neither their language nor tone can be construed as sufficient to make a reasonable innocent

person believe he or she had no choice but to confess. *See Acosta*, 363 F.3d at 1150. Also weighing in favor of a finding that defendant was not in custody is the fact that the stop occurred during daylight on a public street that is directly adjacent to "one of the busiest roads in the city" and situated in front of numerous residences. In fact, several residences are visible in the background of the video; indeed, at one point, it is even possible to see a resident walking in a front yard very near the patrol car. (Gov. Ex. 1, "CD 2" at 16:16:10). *See, e.g.*, *United States v. Parker*, 2010 WL 5313758 (N.D. Ga. Nov. 18, 2010) (finding that the defendant was not in custody for purposes of *Miranda* – even though he was being detained by officers who handcuffed him during an investigative detention and briefly drew their weapons – because the defendant was told he was only being detained, the detective did not point his weapon at the defendant and holstered it before talking to the defendant, the detective's tone was "very laid back" and he did not yell at or threaten the defendant, and "the detention occurred in a public parking lot and was observed by civilians standing in the area"), *adopted by* 2010 WL 5313449 (Dec. 17, 2010).

Finally, although defendant was handcuffed upon his exiting his vehicle and was still handcuffed at the conclusion of the period relevant to this inquiry, the court does not find that this compels the conclusion that he was in custody for *Miranda* purposes. It is settled in this circuit that "[p]olice are permitted to take reasonable action to protect themselves or to maintain the status quo." *Fields*, 178 F. App'x. at 893 (citing *Klapperman*, 764 F.2d at 791 n. 4). Put another way, "during an investigatory stop, an officer can still handcuff a detainee when the officer reasonably believes that the detainee presents a potential threat to safety." *Gray ex rel. Alexander v. Bostic*, 458 F.3d 1295, 1306 (11th Cir.

2006). Officers must, however, "justify the use of handcuffs with some legitimate rationale above and beyond the existence of mere reasonable suspicion." *Harris v. Byner*, 2014 WL 129040, *4 (M.D. Ala. Jan. 14, 2014). *See also United States v. Lester*, 477 F. App'x 697, 700 (11th Cir. 2012)("Because officers may take reasonable steps to ensure their safety so long as they possess an articulable and objectively reasonable belief that the suspect is potentially dangerous, an investigatory stop does not ripen into an arrest simply because an officer handcuffs a suspect.")

In addition, the Eleventh Circuit "ha[s] recognized that '[d]rug dealing is known to be extremely violent,'" *Fields at 893* (quoting *United States v. Diaz-Lizaraza*, 981 F.2d 1216, 1221 (11th Cir. 1993)). The circuit considers the question of whether the detainee was reasonably suspected to be dealing drugs to be relevant to the inquiry concerning whether an officer had an articulable and objectively reasonable belief that the suspect was potentially dangerous such that handcuffs were warranted during the detention phase. *See Fields* at 894 (noting that drug dealing is known to be violent and holding that the officer's "action in handcuffing" a detainee suspected of drug trafficking "was reasonably necessary to preserve the status quo" and "reasonable in order to protect [the officer's] safety" and did not convert the *Terry* stop into an arrest).

In the instant matter, Ritchie articulated four independent bases for placing defendant in handcuffs: (1) the location of the traffic stop, which was "next to probably one of the busiest roads in the city" and near "residences … that [defendant] could flee to," (2) the defendant's "physical stature," as defendant is "bigger, taller than [he and Pendley]," and defendant is heavier than [Ritchie] in weight," (3) the fact that he and

Pendley were "always separated," and at this particular time, Pendley was "back in the patrol car" "running [defendant's] driver's license and some other documents pertaining to the traffic stop," and (4) the odor of marijuana and presence of the digital scale, because in his experience with prior drug cases, "subjects have tried to fight and/or flee from apprehension." In light of the above precedent, the court finds that Ritchie had an articulable and reasonable belief that handcuffs were reasonably needed to preserve the status quo and for officer safety. Therefore, Ritchie's use of handcuffs does not give rise to a conclusion that defendant's freedom of action was curtailed to a degree associated with formal arrest.

Ultimately, taking all these factors into account, "a reasonable person in [defendant's] position would not have believed that he [or she] was utterly at the mercy of the police, away from the protection of any public scrutiny, and had better confess or else." *Acosta*, 363 F.3d at 1150. Accordingly, defendant was not in custody. Because defendant was not in custody during the subject time period, no *Miranda* warnings were required. The court finds no Fifth Amendment violation here.[27]

The court also finds that the statements made during the pertinent time period were made voluntarily. In order to show that a statement was involuntary, a defendant must

---

[27] While it is true that Ritchie, when prompted, testified that he was "committed to keeping defendant in custody" after defendant said he had no pistol permit, this testimony does not require the court to determine that defendant was in custody from that point on, as "the initial determination of custody depends on the objective circumstances of interrogation and not on the subjective views harbored by either the officer or the [d]efendant." *United States v. Gonzales*, 2009 WL 3230787, *9 (M.D. Fla. Oct. 9, 2009)(citing *Stansbury v. California*, 511 U.S. 318, 323 (1994)(*per curiam*)(review of precedent demonstrated a "well settled" principle: officer's undisclosed, subjective belief that person questioned is a suspect is irrelevant to objective "in custody" determination).

demonstrate "a substantial element of coercive police conduct." *See Colorado v. Connelly*, 479 U.S. 157 (1986). "A statement is not given voluntarily if it is "extracted by any sort of threats or violence, or obtained by any direct or implied promises, or by the exertion of any improper influence." *Harris v. Dugger*, 874 F.2d 756, 761 (11th Cir. 1989), *cert. denied*, 493 U.S. 1011 (1989). In determining if police conduct is coercive, the court considers a variety of factors, including "the defendant's intelligence, the length of his detention, the nature of his interrogation, the use of any physical force against him, or the use of any promises or inducements by the police." *Hubbard v. Haley*, 317 F.3d 1245, 1253 (11th Cir. 2003). "Sufficiently coercive conduct normally involves subjecting the accused to an exhaustingly long interrogation, the application of physical force or the threat to do so, or the making of a promise that induces a confession." *United States v. Thompson*, 422 F.3d 1285, 1295-96 (11th Cir. 2005). Ultimately, "[t]he determination of whether a confession is voluntary depends on whether, under all the surrounding circumstances, the statement was the product of the accused's free and rational choice." *United States v. Jones*, 32 F.3d 1512, 1516 (11th Cir. 1994)(internal quotations omitted). It is the government's burden to establish, by a preponderance of the evidence, that a challenged confession is voluntary. *United States v. Lall*, 607 F.3d at 1285.

Having carefully reviewed the traffic stop videos, the court concludes that the conduct of the officers was not of the kind that would render defendant's statements involuntary. Although Ritchie directed defendant to exit the vehicle, Ritchie was entitled to do so, especially given the odor of marijuana and the presence of the digital scale. *See United States v. Spoerke*, 568 F.3d 1236 (11th Cir. 2009)("During a lawful traffic stop,

officers also may take steps that are reasonably necessary to protect their personal safety

… including requiring the driver and passengers to exit the vehicle as a matter of

course.")(internal quotations omitted). As previously discussed, Ritchie was also entitled

to handcuff defendant. Furthermore, defendant was detained for a matter of minutes before

making the statements; therefore, he was not subjected to an "exhaustingly long

interrogation." Finally, the officers did not draw their weapons or make any threats or

promises. On balance, the court finds that the government has met its burden of

demonstrating that the encounter was free of coercion and that defendant's statements were

made voluntarily.

### D.   Was the custodial interrogation tainted by earlier constitutional violations?

Defendant argues in his supplemental brief that defendant's statements to Ioimo

were the "direct result" or "fruit" of Ritchie and Pendley's subjecting him to an illegal stop,

search, and unwarned custodial interrogation. Because the court has already determined

that neither the stop, nor the search, nor the interrogation – up until the point that defendant

confessed that he was a convicted felon – was unconstitutional, the question of whether

these warrant suppression of the warned statements is moot.

Whether defendant's statements to Ioimo are the "direct result" or "fruit" of

*Miranda* violations which occurred during the remainder of the stop – *i.e.*, after defendant

confessed that he is a convicted felon – warrants further discussion. In *Oregon v. Elstad*,

470 U.S. 298 (1985), the Supreme Court rejected a defendant's contention that statements

made during a second confession should have been suppressed as the "fruit of the

poisonous tree" after officers' failure to advise him of his rights before he confessed the first time. *Id.* at 302, 309. Rather, the Court explained, the salient question is whether or not the second confession was made "knowingly and voluntarily." *Id.* This general rule is, however, subject to an exception carved out by the Court in *Missouri v. Seibert*, 542 U.S. 600 (2004). In that case, the Court held that where officers deliberately attempt to circumvent *Miranda* through the use of a calculated "question first" or "two-step" strategy, the second, warned statement should be suppressed. Thus, in determining whether or not the statements defendant made to Ioimo are due to be suppressed, the court must ask whether *Elstad* or *Seibert* applies rather than whether or not the warned confession was the "direct result" or "fruit" of the warned confession. The parties addressed this issue in their supplemental briefs. In answering this question, the court assumes, without deciding – and for the purposes of addressing defendant's argument only – that defendant was subjected to a custodial interrogation from the point he confessed to being a convicted felon until the end of the stop.

Defendant contends that defendant's post-*Miranda* statements to Ioimo are due to be suppressed based on the Supreme Court's holding in *Seibert*. The government disputes that the *Seibert* decision applies to this case and argues that, if there were a *Miranda* violation in the period of time after which defendant admitted he was a convicted felon, the Supreme Court's earlier decision in *Elstad* governs. The Eleventh Circuit analyzed the interaction of these two cases in *Street,* 472 F.3d at 1312-14. It explained:

> In determining whether a properly warned confession is admissible where the defendant has first given an unwarned or improperly warned confession, we turn to the Supreme Court's decisions in *Oregon v. Elstad,*

470 U.S. 298, 105 S.Ct. 1285, 84 L.Ed.2d 222 (1985), and *Missouri v. Seibert*, 542 U.S. 600, 124 S.Ct. 2601, 159 L.Ed.2d 643 (2004). *Elstad* sets out the general rule that the existence of a pre-warning statement does not require suppression of a post-warning statement that was knowingly and voluntarily made, 470 U.S. at 309, 105 S.Ct. at 1293, while *Seibert* sets out an exception for situations where police employ a deliberate "question first" strategy. 542 U.S. at 617, 124 S.Ct. at 2613.

In *Elstad*, the defendant confessed after being subjected to unwarned custodial questioning at his house. 470 U.S. at 300–01, 315, 105 S.Ct. at 1288–89, 1296. The officers then took the defendant to their headquarters and an hour later gave him *Miranda* warnings for the first time. *Id.* at 301, 105 S.Ct. at 1289. He waived his rights and made a full confession, both orally and in a signed statement. *Id.* The Supreme Court rejected the defendant's contention that the second confession should have been suppressed as "fruit of the poisonous tree," the poison being the failure to advise him of his rights before he confessed the first time. *Id.* at 302, 309, 105 S.Ct. at 1289, 1293. The Court explained that it would be an "unwarranted extension of *Miranda*" to suppress not only unwarned statements but also later statements that were knowingly and voluntarily made after proper warnings were finally given. *Id.*

The rule of *Elstad* is that "the admissibility of any subsequent statement should turn in these circumstances solely on whether it is knowingly and voluntarily made." *Id.* In making this determination courts are not to presume that the existence of the earlier unwarned statement compelled the defendant to give another one, but instead should assume that ordinarily giving proper *Miranda* warnings removes the effect of any conditions requiring suppression of the unwarned statement. *Id.* at 314, 105 S.Ct. at 1296. Where both confessions are voluntary, there is no justification for suppressing the "highly probative evidence of a voluntary confession." *Id.* at 312, 105 S.Ct. at 1294–95; *see also id.* at 318, 105 S.Ct. at 1298 ("The relevant inquiry is whether, in fact, the second statement was also voluntarily made.").

The *Elstad* general rule applies both to instances, like this one, where the initial statements are inadmissible because of defective warnings and to those where no warnings were given at all before the first statements. *See Bryant v. Vose*, 785 F.2d 364, 366–67 (1st Cir.1986); *Watson v. DeTella*, 122 F.3d 450, 453–55 (7th Cir.1997). Under the *Elstad* general rule, the statements Street made after he was fully advised of his *Miranda* warnings are admissible, because all of his statements were knowingly and voluntarily made. Street was questioned in his home; he was not threatened or coerced;

he was not confined or restrained; the questioning was done in a conversational tone; it was not unduly prolonged; he was told of some of his rights early on; and given his twenty-plus years of law enforcement experience, Street was familiar with investigative processes and techniques.

The *Elstad* general rule is subject to the *Seibert* exception, which is aimed at putting a stop to the deliberate use of a particular police tactic employed for the specific purpose of undermining the *Miranda* rule. 542 U.S. at 618, 124 S.Ct. at 2614 (Kennedy, J., concurring). The tactic in question is one where the police are instructed, as a matter of policy, to purposefully withhold *Miranda* warnings while interrogating a suspect in custody in order to obtain a full confession first and then provide him with full warnings and get him to re-confess. *Id.* at 605–06, 124 S.Ct. 2601. The process is known as the "two-step" or "question first" tactic, and it did not find favor in the Supreme Court.

Because *Seibert* is a plurality decision and Justice Kennedy concurred in the result on the narrowest grounds, it is his concurring opinion that provides the controlling law. *United States v. Gonzalez–Lauzan,* 437 F.3d 1128, 1136 n. 6 (11th Cir.2006); *see also Romano v. Oklahoma,* 512 U.S. 1, 9, 114 S.Ct. 2004, 2010, 129 L.Ed.2d 1 (1994); *Marks v. United States,* 430 U.S. 188, 193, 97 S.Ct. 990, 993, 51 L.Ed.2d 260 (1977). As Justice Kennedy explained, suppression of a post-warning confession is required if "the two-step interrogation technique [is] used in a calculated way to undermine the *Miranda* warning." *Seibert,* 542 U.S. at 622, 124 S.Ct. at 2616. That means that if an officer employs a strategy of deliberately questioning an in-custody suspect without any *Miranda* warnings in order to get a confession, planning to later warn the suspect and get him to repeat his confession, the post-warning confession is inadmissible unless the officer took specific curative steps to ensure that the mid-interrogation warnings achieved the purpose the *Miranda* decision intended. *Id.* at 621, 124 S.Ct. at 2615–16. The curative measures required are a "substantial break in time and circumstance between the prewarning statement and the *Miranda* warning" or "an additional warning that explains the likely inadmissibility of the prewarning custodial statement." *Id.* at 622, 124 S.Ct. at 2616. Curative measures are necessary only where the "question first" tactic has been used. Otherwise, the *Elstad* general rule that post-warning statements are admissible, even where they follow pre-warning statements that are not, governs.

We will assume for purposes of this case that the *Seibert* "question first" exception may apply when incomplete or defective warnings are given, just as when no warnings are given. In deciding whether the agents used the "question first" tactic against Street, we consider the totality of the

circumstances including "the timing, setting and completeness of the prewarning interrogation, the continuity of police personnel and the overlapping content of the pre– and post-warning statements." *United States v. Williams,* 435 F.3d 1148, 1159 (9th Cir.2006).

The questioning of Street before he was given the full *Miranda* warnings was brief and general. Agent Fitzgerald did not withhold *Miranda* warnings, solicit a full confession, and then lead Street back through his confession again. Fitzgerald gave Street partial warnings up front. Because giving any warnings undermines the effectiveness of the "question first" tactic, the fact that some warnings were given strongly evidences that the tactic was not being used. Fitzgerald did not set out to intentionally circumvent or undermine the protections the *Miranda* warnings provide. He just messed up. In order for *Seibert* to apply, "the two-step interrogation technique [must be] used in a calculated way to undermine the *Miranda* warning." 542 U.S. at 622, 124 S.Ct. at 2616. Because it was not, this is not a *Seibert* exception case.

This is instead an *Elstad* general rule case. *Seibert,* 542 U.S. at 622, 124 S.Ct. at 2616 ("The admissibility of postwarning statements should continue to be governed by the principles of *Elstad* unless the deliberate two-step strategy was employed."). As we have already explained, under the *Elstad* general rule the incriminating statements Street gave after he received the full, second set of *Miranda* warnings were properly admitted. The same cannot be said of the statements Street made after he was in custody but before he was given the second set of warnings. Any evidence of those earlier statements should not have been put before the jury.

*Id.* at 1312–1314.

The court must now determine whether the instant case falls under the above-described exception set forth in *Seibert* – *i.e.*, whether the pre-*Miranda* custodial interrogation, combined with the post-*Miranda* custodial interrogation, bears the hallmarks of a "two-step" or "question first" interrogation.

Under the totality of the circumstances, and considering "the timing, setting and completeness of the prewarning interrogation, the continuity of police personnel and the overlapping content of the pre- and post-warning statements," *Street*, 472 F.3d at 1314, the

court cannot conclude that a "two-step" or "question-first" interrogation took place. The court first must consider the duration of the intervening time in order to determine if the officers' interrogation violated the Fifth Amendment. The traffic stop began at approximately 4:00 p.m. Defendant confessed to being a convicted felon at 4:11 p.m. No testimony was offered regarding when the traffic stop ended or what time defendant arrived at the police station. The dash camera video ends at the 16:41:54 mark (or 4:41 p.m.). Ioimo's interview began at 6:10 p.m. Absent relevant testimony or evidence, it is impossible for the court to know how much time transpired between the two periods of questioning. However, it is reasonable to infer that once the traffic stop concluded and defendant was placed under arrest, Ritchie and Pendley had to transport defendant to the police station and defendant then had to go through the booking process. After these events occurred, defendant may or may not have gone directly to the interview with Ioimo. Regardless, common sense dictates that there was some gap between the two interviews. It is possible that the break was as long as an hour, but the court recognizes that it could have been shorter. Even assuming that it was shorter, the court still cannot find that the length of this intervening time – taken alone – demonstrates that the officers engaged in "two-step" or "question first" interrogation, especially because during this time both the setting of the questioning and the interrogators changed.

The court must next consider the "setting and completeness of the prewarning interrogation." With regard to setting, Ritchie and Pendley asked questions of defendant while at the side of the road; however, the post-*Miranda* interview was conducted at the Montgomery Police Department Special Operations Division. (Doc. 32 at p. 2). The court

also considers the "continuity of police personnel" between the settings. Here, there is no evidence that Ioimo participated in the roadside questioning of defendant. Moreover, neither Ritchie nor Pendley was present in the post-*Miranda* interview. Further, although Ioimo is employed by the Montgomery Police Department, the parties do not dispute that, unlike Ritchie and Pendley, he is assigned to the ATF Task Force.[28] Thus, the setting weighs in favor of determining there was no "two-step" or "question first" interrogation.

The "completeness of the prewarning interrogation" weighs less in the government's favor. From the point that defendant admitted he was a convicted felon until the conclusion of the stop, Ritchie asked defendant numerous questions about the digital scale, the gun, his drug use, and whether he deals drugs. This notwithstanding, Ritchie's interrogation was not as complete as Ioimo's, and this factor is not sufficient – on its own – to tip the scale in favor of a determination that the officers deliberately used a calculated "two-step" or "question first" strategy.

The final factor for consideration is "the overlapping content of the pre- and post-warning statements." Ioimo testified that before he interviewed defendant, he received information from the "other officers" – *i.e.*, "basic facts of where [the traffic stop] took

---

[28] There is no testimony indicating that defendant specifically knew that Ioimo was working with the ATF, but, during the roadside conversation with Ritchie, defendant indicated a familiarity with the different divisions of the police department, and specifically with the Special Operations Division, or S.O.D. As noted in the facts, at the 16:17:40 mark, Ritchie asked defendant if he had any contraband on his person. Defendant responded, "I […] came clean with you." Ritchie replied, "No, you didn't. Do you have anything on you whatsoever – because if I take you down to S.O.D., and you have something in there, it's going to be a bad day." Defendant responded, "You ain't going to take me to S.O.D., is you?" Given his familiarity with law enforcement structure, it is possible that defendant understood he was being interviewed by individuals from different divisions or departments and with possibly different objectives.

place, what [the officers] located, [and] why [the officers] stopped him."[29] Consistent with this testimony, the audio recording shows that during the interview, Ioimo referenced a few things the "other officers" had told him. For instance, approximately halfway into the interview – without defendant first mentioning the scale or the razor blade –Ioimo said to defendant: "Let me ask you about that scale in the car. I mean, do you personally use?" (Gov. Ex. 1, "CD 4" at 10:32). Defendant responded that the scale is for personal use. Ioimo then said, "Cocaine, I'm assuming, with the razor blade and the … ." Ioimo later asked, "Let me ask you this – where was that scale at in relation – in the car – was it where your insurance was, or where your registration should have been?" (Gov. Ex. 1, "CD 4" at 20:34). Defendant responded that it was in the "middle part" and confirmed that he opened the center console when looking for his registration. Ioimo then asked, "[A]nd that's when the officer saw it?"  Defendant responded, "yeah."  Finally, Ioimo also said to defendant, "Let me ask you about the tag because the officers mentioned that they observed you making a turn without a turn signal and they also said that there was also a – I'm just telling you what I was advised of – they also mentioned . . . the expired ta[g]." (Gov. Ex. 1, "CD 4" at 18:57).

There is no doubt that Ritchie and Pendley relayed information regarding the stop to Ioimo in some fashion; thus, there was "overlapping content of the pre- and post-warning statements." This notwithstanding, it is difficult to imagine a situation in which the

---

[29] Defendant stresses in his supplemental brief that "Officers Pendley and Ritchie specifically contacted Mr. Ioimo, reaching out to him in the traffic stop with the intent to have him further interrogate [defendant] based on the information they had already gathered." (Doc. 47 at 8). None of the three videos captures any conversations between either of the two officers and Ioimo. But, as set forth above, Pendley's body camera did capture Pendley's two attempts during the traffic stop to secure Ioimo's number.

detaining officer would share no information with a task force officer or other officer who is charged with interviewing a suspect. Furthermore, the court is not convinced that Ioimo's references to information he obtained from the other officers are sufficient to demonstrate that he colluded with them in order to circumvent *Miranda*.

Taking all these factors into consideration, there is simply not enough evidence for the court to conclude that Ritchie and Pendley deliberately withheld *Miranda* warnings until after defendant had made incriminating statements, and colluded with Ioimo in an *intentional* attempt to coerce defendant to repeat his unwarned confessions. The instant factual scenario simply does not bear the hallmarks of a "question first" or "two-step" tactic strategy contrived to circumvent *Miranda*; therefore, *Seibert* has no application here.

Having determined that this case is governed by the general rule of *Elstad*, rather than the *Seibert* exception, the court recognizes that "admissibility of [the] subsequent statement should turn … solely on whether it is knowingly and voluntarily made. In the absence of circumstances showing otherwise, a defendant's waiver of *Miranda* rights is presumed to be voluntary." *United States v. Sagoes*, 389 F. App'x. 911, 914 (11th Cir. 2010) (citing *United States v. Gonzalez-Lauzan*, 437 F.3d 1128, 1133-4; 1137). Courts "determine whether a statement was made voluntarily, and thus was 'the product of an essentially free and unconstrained choice,' by examining the totality of the circumstances." *Id.* at 914 (citing *Hubbard v. Haley*, 317 F.3d 1245, 1252 (11th Cir. 2003). Among the factors to consider are "the defendant's intelligence, the length of his detention, the nature of the interrogation, the use of any physical force against him, or the use of any promises or inducements by police." *Id.* (citing *Hubbard* at 1253).

Even assuming that Ritchie and Pendley conducted an unwarned custodial of interrogation of defendant after he admitted that he was a convicted felon, the court has no evidence before it which shows that defendant's statements to Ioimo were not knowingly and voluntarily made. There is no evidence that defendant was threatened, coerced, unduly confined or restrained, or subjected to physical force. Nor was defendant offered any promises or inducements to confess. Moreover, the audio recording suggests that Ioimo removed defendant's handcuffs prior to beginning the interrogation. The audio also demonstrates that Ioimo advised defendant of his *Miranda* rights early in the conversation and that the interview was conducted entirely in a relaxed, conversational tone, without undue pressure or threats. Therefore, under the *Elstad* general rule, the statements defendant made to Ioimo after he was fully advised of his *Miranda* warnings are admissible.[30]

## Conclusion

---

[30] Defendant argues that *Elstad* has no application in this case because it presupposes a voluntary, yet unwarned, initial confession. However, as with the period prior to defendant's confession, which was discussed at length in section C of this Recommendation, there is no evidence of coercion. Specifically, there is no indication that either officer subjected defendant to an exhaustingly long interrogation, applied physical force or threatened to do so, made a promise that induced a confession, or engaged in any other coercive activity. Moreover, while Ritchie was direct and used colloquial language that would be inappropriate in a courtroom, the court does not find that his language or tone rose to such a harsh level that a defendant would feel as though he or she had no choice but to confess. *See Acosta*, 363 F.3d at 1150. The only other differences between the period of time discussed in Section C and the period of time relevant to this inquiry are that (1) defendant was asked to sit in the back of the patrol car and (2) defendant was detained for a longer period of time. Viewing these facts in the totality of the circumstances, the court does not find that a reasonable person in defendant's position would have felt he or she had no choice but to confess. Based on a careful review of the videos and testimony of record, the court is satisfied that the statements given during this portion of the traffic stop were given voluntarily.

Accordingly, for the foregoing reasons, it is the RECOMMENDATION of the Magistrate Judge that defendant's motion to suppress (Doc. 32), as supplemented (Docs. 36 and 47), be DENIED.

It is further

ORDERED that the parties are DIRECTED to file any objections to the said Recommendation on or before August 22, 2017. Any objections filed must specifically identify the findings in the Magistrate Judge's Recommendation objected to. Frivolous, conclusive or general objections will not be considered by the District Court. The parties are advised that this Recommendation is not a final order of the court and, therefore, it is not appealable.

Failure to file written objections to the proposed findings and recommendations in the Magistrate Judge's report shall bar the party from a de novo determination by the District Court of issues covered in the report and shall bar the party from attacking on appeal factual findings in the report accepted or adopted by the District Court except upon grounds of plain error or manifest injustice. *Nettles v. Wainwright*, 677 F.2d 404 (5th Cir. 1982). *See Stein v. Reynolds Securities, Inc.*, 667 F.2d 33 (11th Cir. 1982). *See also Bonner v. City of Prichard*, 661 F.2d 1206 (11th Cir. 1981, *en banc*), adopting as binding precedent all of the decisions of the former Fifth Circuit handed down prior to the close of business on September 30, 1981.

DONE, on this the 8th day of August, 2017.

/s/ Susan Russ Walker
Susan Russ Walker
United States Magistrate Judge