IN THE DISTRICT COURT OF THE UNITED STATES FOR THE

MIDDLE DISTRICT OF ALABAMA, NORTHERN DIVISION

UNITED STATES OF AMERICA,  )
                           )    CRIMINAL ACTION NO.
     v.                    )       2:17cr102-MHT
                           )          (WO)
KENDALL DEWIGHT SHINE      )

OPINION AND ORDER

The court is presented with the issues of whether statements made by defendant Kendall Dewight Shine at what was initially a traffic stop (the 'first interrogation') and statements made later at the Montgomery police station (the 'second interrogation') should be suppressed. Because Shine's statements during the first interrogation are essentially duplicative of later statements and, as the government acknowledges, are not needed for its case, the court presumes for its analysis that Shine was in custody during that interrogation under *Miranda v. Arizona*, 384 U.S. 436 (1966), and that those statements should be suppressed. Nevertheless, relying principally on *Missouri v. Seibert*, 542 U.S. 600 (2004), the court

holds that the statements made during the second interrogation should not be suppressed.

## I. Procedural Background

Shine is charged with one count of being a felon in possession of a firearm, in violation of 18 U.S.C. § 922(g)(1). He filed a motion to suppress asserting several Fourth and Fifth Amendment claims. After holding an evidentiary hearing, the magistrate judge entered a recommendation that the motion should be denied in its entirety. Shine filed an objection challenging, among other things, the magistrate judge's conclusions (1) that he was not in custody during the first interrogation and thus not entitled to *Miranda* warnings, and (2) that *Seibert* does not require the suppression of his statements at the second interrogation.[1]

---

1. To the extent that Shine made other objections, the court adopts the recommendation as to those objections and overrules them.

The court conducted a completely new evidentiary hearing.  As a result, the court is not bound by the magistrate judge's factual findings.


## II.  Factual Background

The court's factual findings, which are based on video and audio recordings from dashboard and body cameras as well as witness testimony at the evidentiary hearing, are as follows.    Officers S.K. Pendley and T.J. Ritchie stopped Shine's truck, based on two alleged turn-signal violations and what the officers believed--apparently reasonably but mistakenly--was an expired tag.    Officer Pendley approached the passenger-side window of the truck and asked Shine whether he had a license and proof of registration.  As Shine opened the truck's center console to search for registration documents, Pendley saw a digital scale in the console.  Officer Ritchie then approached the truck on the driver's side and smelled marijuana from its open windows.  Ritchie took over the questioning and

asked Shine about the ostensibly expired registration. Pendley then told Ritchie that he had seen a digital scale in the console.

Based on the smell of marijuana and the digital scale, Ritchie began to suspect that Shine was involved in the distribution of narcotics, so he asked Shine if there was anything on him 'that [he] should know about.' He ordered Shine to exit his truck and place his hands on the windshield. Ritchie then questioned Shine about the digital scale and ordered him to place his arms behind his back. At that point, Ritchie stated, "Right now, you are not under arrest; you are just being detained, okay?" He then handcuffed Shine, asked for consent to search Shine's pockets, and ordered him to spread his feet. After searching Shine's pockets, Ritchie again questioned him about the digital scale--specifically whether it was "drug paraphernalia." Ritchie repeated the question, and then ordered Shine to step away from his truck and sit on the hood of the patrol car.

Ritchie began to search Shine's truck, where he discovered a black handgun underneath the driver's seat. He then stepped back to his patrol car and asked Shine whether he had a weapon's permit. Shine admitted he did not.

At this point, Shine was still sitting handcuffed on the patrol car hood, with the car's windshield to his back; Officer Pendley stood diagonally to his right approximately a few feet away, and Officer Ritchie stood diagonally to his left at a similar distance. Apparently upset by the fact that Shine had not told him about the handgun in his truck, Ritchie raised his voice and lectured Shine about the importance of responding truthfully to his questions. Ritchie then asked Shine whether he is a convicted felon, whether he is involved in gangs, and whether he sells illegal drugs. Shine admitted to being a convicted felon, but denied the other allegations.

Ritchie then went back to Shine's vehicle to continue searching, and found a razor blade and white

powder residue on the digital scale.  After the search, Ritchie walked back to the patrol car to speak with Pendley, and ordered Shine to "stay right there" on the hood of the car.  Ritchie then returned to the hood of the patrol car and resumed interrogating Shine, this time employing a different tactic: "It's all about respect.  You've shown me respect.  I've shown you respect, alright?  That's the name of the game, I get that.  No matter what you do, it's about respect."  Ritchie asked Shine where he bought the gun and where he was going, and questioned him repeatedly about the razor blade, scale, and whether he uses and sells drugs.  Shine eventually admitted to using, but not selling, cocaine.

After a few minutes of such questioning, Ritchie moved Shine from the hood to the inside of the patrol car, and, standing with the door ajar, asked Shine repeatedly over the next minute and a half about where Shine buys drugs.  After Shine did not respond, Ritchie stated: "You've gotta give me something man.  This drug

paraphernalia, that's another charge.  Now if you don't want to talk you don't have to talk, I'm just trying to establish a rapport with you."  Ritchie added that Shine was "not under arrest."

In sum, in relation to the present charges, Shine admitted that he did not have a permit for the gun in the car and that he was a convicted felon.  At no point during the above interactions, which lasted about 13 minutes from Shine's handcuffing to the end of Ritchie's questioning, did Officer Ritchie or Pendley administer *Miranda* warnings.

After formally arresting Shine at the conclusion of the traffic stop, the officers took him to the Montgomery Police Department, where Agent Jeffrey Ioimo of the federal Bureau of Alcohol, Tobacco and Firearms provided *Miranda* warnings and questioned Shine.  During this second interrogation, Shine admitted that he owned the handgun found in his vehicle and that he was a convicted felon.  He was later charged with being a felon in possession of a firearm.

## III. Standard of Review

District courts review de novo any part of a magistrate judge's report and recommendation to which a party has properly objected. Fed. R. Civ. P. 72(b)(3). "[T]he district judge may accept, reject, or modify the recommended disposition." *Id.* A district court may serve as a factfinder and overturn a magistrate judge's factual findings when it conducts a new evidentiary hearing. *See United States v. Cofield*, 272 F.3d 1303 (11th Cir. 2001) (district court required to hold a new evidentiary hearing to overturn findings based on credibility) (citing *United States v. Raddatz*, 447 U.S. 667 (1980)).

## IV. Discussion

At issue are two sets of statements: those Shine made during his non-*Mirand*ized first interrogation during the traffic stop, and those he made during his *Mirand*ized second interrogation at the police station.

8

As mentioned above and as relevant to this case, during the first interrogation Shine admitted that he was a convicted felon and that he did not have a permit for the gun found in his truck. In the second interrogation, he admitted that he was a convicted felon and that he owned the gun.

At oral argument, the court asked the parties whether suppressing the first-interrogation statements without suppressing the second-interrogation statements could affect the outcome of the case. The government conceded, and the court agrees, that evidence from the first interrogation is essentially cumulative, and therefore not necessary for the government's case. However, Shine's *Seibert* claim as to the second set of statements may affect the viability of the government's case, and that claim depends upon the existence of a prior, non-*Mirand*ized custodial statement. Because the court finds that the second set of statements should not be suppressed, it will presume without reaching the issue that Shine was in custody during the first

interrogation, for the purpose of its *Seibert* analysis. Nonetheless, in order to provide clarity for future analyses, the court now addresses what it finds to be certain legal errors in the recommendation's analysis of the custody issue.

### A. Legal Errors in the Recommendation

The magistrate judge's recommendation correctly cites *United States v. Street*, 472 F.3d 1298 (11th Cir. 2006) for determining whether Shine was 'in custody' while handcuffed and questioned during the traffic stop. R&R (doc. no. 55), at 25-26. "[A] person is in 'custody' for *Miranda* purposes only when there is a formal arrest or restraint on freedom of movement of the degree associated with a formal arrest." *Street*, 472 F.3d at 1310. Under *Street*, whether there has been a "restraint on freedom of movement of the degree associated with a formal arrest" is determined by considering the "totality of the circumstances," "including whether the officers brandished weapons,

touched the suspect, or used language or a tone that indicated that compliance with the officers could be compelled." *Id.* at 1309.

However, the recommendation's application of *the Street* test erred in two respects. First, the recommendation grafted onto the *Street* test--perhaps even substituting as the ultimate inquiry[2]--an additional requirement that, in order to be in custody, "a reasonable person in defendant's position would ... have believed that he or she was utterly at the mercy of the police, away from the protection of any public scrutiny, and had better confess or else." R&R (doc. no. 55) at 29 (quoting *United States v. Acosta*, 363 F.3d 1141, 1150 (11th Cir. 2004)) (brackets omitted). Second, in addressing the significance of Shine's handcuffing, the recommendation improperly conflated the Fourth Amendment 'arrest' inquiry with the Fifth Amendment issue of whether Shine was 'in custody,'

_____

2. The recommendation states that "[u]ltimately" Shine did not meet this requirement and "[a]ccordingly ... was not in custody." *Id*. at 29.

which had the effect of minimizing the handcuffing's importance under *Miranda*.

### 1. Misapplication of *Acosta* language

The recommendation, quoting *United States v. Acosta*, 363 F.3d 1141 (11th Cir. 2004), first erred by appearing to graft onto its *Street* analysis a further requirement that Shine "believed that he or she was utterly at the mercy of the police, away from the protection of any public scrutiny, and had better confess or else." R&R (doc. no. 55), at 29 (quoting *Acosta*, 363 F.3d at 1150 (brackets omitted). To treat this '*Acosta* language'--which was taken in part from the Supreme Court's opinion in *Berkemer v. McCarty*, 468 U.S. 420 (1984)--as a separate standard runs contrary to the Supreme Court's and Eleventh Circuit's case law.

The Supreme Court in *California v. Beheler*, 463 U.S. 1121 (1983) (per curiam), established that "custody" under *Miranda* encompasses either a "formal arrest or restraint on freedom of movement of the

degree associated with a formal arrest." *Id*. at 1125. A year later, the Court in *Berkemer* sought to clarify "whether the roadside questioning of a motorist detained pursuant to a routine traffic stop should be considered 'custodial interrogation." 468 U.S. at 436. *Berkemer* involved a motorist who was stopped by police, asked to perform a field sobriety test, and then asked whether he had consumed any intoxicants. The Court held that, although such a stop "significantly curtails the 'freedom of action' of the driver and the passenger," such that motorists are not free to leave during such an encounter,[3] it does not normally rise to 'custody' under *Miranda*. 468 U.S. at 436. However,

---

3. The 'in custody' standard under *Miranda* is higher than the 'free-to-leave' test used to determine whether an individual has been seized within the meaning of the Fourth Amendment, which requires only that a reasonable person in that individual's position would not feel that they were at liberty to terminate the encounter. *Street*, 472 F.3d at 1310. Thus, "While seizure is a necessary prerequisite under *Miranda*," to be 'in custody' requires either that an individual has been subject to a formal arrest or that "a reasonable person would have understood his freedom of action to have been curtailed *to a degree associated with formal arrest*." *United States v. Luna-Encinas*, 603 F.3d 876, 881 (11th Cir. 2010).

*Berkemer* expressly declined to establish a bright-line rule that questioning during traffic stops never requires *Miranda* warnings.  468 U.S. at 441.

In explaining its reasoning, the Court noted "two features of an ordinary traffic stop [that] mitigate the danger that a person questioned will be induced 'to speak where he would not otherwise do so freely.'"  *Id.* at 437 (quoting *Miranda*, 384 U.S. at 467):

> "First, detention of a motorist pursuant to a traffic stop is presumptively temporary and brief.  The vast majority of roadside detentions last only a few minutes.  A motorist's expectations, when he sees a policeman's light flashing behind him, are that he will be obliged to spend a short period of time answering questions and waiting while the officer checks his license and registration, that he may then be given a citation, but that in the end he most likely will be allowed to continue on his way. ...
>
> "Second, circumstances associated with the typical traffic stop are not such that the motorist feels completely at the mercy of the police. ... Perhaps most importantly, the typical traffic stop is public, at least to some degree."

*Id*. at 437-38.  Notably, *Berkemer* emphasized repeatedly that it addressed a 'routine' or 'typical' traffic

stop, where the defendant expects a "temporary and brief" interaction that may result in a citation but not major charges. With the above-quoted language, the Court did not purport to announce a new rule--indeed the Court has not subsequently applied it as such--but rather to provide some reasons for why the typical traffic stop does not involve a restraint equivalent to a formal arrest. *See Thompson v. Keohane*, 516 U.S. 99, 112 (1995) (recognizing that "the ultimate inquiry" remains "was there a formal arrest or restraint on freedom of movement of the degree associated with a formal arrest") (internal quotation marks omitted); *United States v. Campbell*, 741 F.3d 251, 255-56 (1st Cir. 2013) ("[T]he Court [in *Berkemer*] established no categorical rule. Indeed, it held that *Miranda* warnings would be required 'as soon as a suspect's freedom of action is curtailed to a 'degree associated with formal arrest.' Thus, our task post-*Berkemer* is to determine whether the facts of a specific case indicate a situation more akin to a routine traffic stop, ... or

indicate that a suspect has been 'subjected to restraints comparable to those associated with a formal arrest[.]'") (citations omitted).

In *Acosta*, the Eleventh Circuit--after conducting a totality-of-the-circumstances analysis of whether the suspect there was in custody--used some of the *Berkemer* language to explain its conclusion: "The totality of the circumstances were such that a reasonable person in Acosta's position would not have believed that *he was utterly at the mercy of the police, away from the protection of any public scrutiny, and had better confess or else*. No *Miranda* warnings were required at the time." 363 F.3d at 1150 (emphasis added). In doing so, the *Acosta* court (in particular with its language "he was utterly at the mercy of the police ... and had better confess or else") was explaining *why a person in Acosta's particular circumstances* would not be in custody; it did not purport to establish a *new and higher categorical evidentiary floor* for a finding of custody that applies exclusively to traffic stops.

First, and notably, *Acosta* preceded *Street*, the Circuit's leading case, by two years. The *Street* court cited *Acosta* but did not include the *Acosta* language quoted in the recommendation, nor did *Street* attempt to set out a 'custody' inquiry for situations other than traffic stops, separate from any test established in *Acosta*. Indeed, the only other published Eleventh Circuit case to use the *Acosta* language properly applies *Street* as the central inquiry, and then adds the *Acosta* language for emphasis. *See United States v. Luna-Encinas*, 603 F.3d 876, 881-82 (11th Cir. 2010).

By contrast, the recommendation appears to have either layered on the *Acosta* language as an additional requirement or in some sense substituted this language for the ultimate inquiry of whether a defendant was subject to restraints of the degree associated with a formal arrest: "Ultimately, taking all these factors into account, 'a reasonable person in [defendant's] position would not have believed that he [or she] was utterly at the mercy of the police, away from the

protection of any public scrutiny, and had better confess or else.' *Acosta*, 363 F.3d at 1150. Accordingly, defendant was not in custody." R&R (doc. no. 55) at 29. To the extent that it did so, the recommendation departed from Eleventh Circuit precedent.

In addition, the imposition of the *Acosta* language as a separate standard or requirement runs contrary to Supreme Court precedent. The *Berkemer* Court mentioned that a motorist in a 'typical traffic stop' does not "feel[] completely at the mercy of the police" due in part to being in public as *one reason among others* to illustrate why such a stop does not normally render a person 'in custody,' *Berkemer*, 468 U.S. at 438; *see United States v. Newton*, 369 F.3d 659, 675-76 (2d Cir. 2004) (recognizing the presumptively "temporary and brief" factor under *Berkemer*, and concluding that a defendant was 'in custody' because "a reasonable person finding himself placed in handcuffs by the police would ordinarily conclude that his detention would not

18

necessarily be temporary or brief and that his movements were now totally under the control of the police"); *United States v. Leong*, 116 F.3d 1474 (Table) (4th Cir. 1997) (per curiam) ("Whether the investigative stop had evolved into a custodial interrogation when Leong confessed depends upon whether all the facts and circumstances would have led a reasonable person to believe that the detention was not temporary and that he would not soon be free to leave."); *United States v. Moore*, 104 F.3d 377, 389 n.5 (D.C. Cir. 1997) ("[T]he *Berkemer* Court ... recognized that the distinction between a 'traffic stop' and being 'in custody' rested not only upon the fact that the stop would be 'presumptively temporary and brief,' but equally upon the motorist's expectations 'that in the end he most likely will be allowed to continue on his way.'") (quoting *Berkemer*, 468 U.S. at 437). In observing conditions that render a 'typical' traffic stop non-custodial, the Court did not establish a test requiring the negation of each condition in order to

establish that a person was 'in custody.'[4]   Similarly,
while being "completely at the mercy of the police"
very likely means one is 'in custody' under *Miranda*,
one need not be subject to that level of coercion or
isolation to be considered 'in custody.'

Second, treating the *Acosta* language as a separate
'in custody' standard for traffic stops runs contrary
to the Court's precedent because this stringent
language appears much closer to the standard for
determining that a confession was 'involuntary.'   A
confession is involuntary where there has been "a
substantial element of coercive police conduct,"
*Colorado v. Connelly*, 479 U.S. 157 (1986), which
"depends on whether, under all the surrounding
circumstances, the statement was the product of the
accused's 'free and rational' choice," *United States v.
Jones*, 32 F.3d 1512, 1516 (11th Cir. 1994) (quoting

---

4. To understand the distinction, consider the
statement, "the gathering was small and intimate
because there were three people."  It does not follow
that there *must* be three people in order for a
gathering to be small and intimate.

20

*United States v. Vera*, 701 F.2d 1349, 1364 (11th Cir. 1983)). The *Acosta* language states that "a reasonable person in [defendant's] position would not have believed that he [or she] was utterly at the mercy of the police, away from the protection of any public scrutiny, and *had better confess or else.*" *Acosta*, 363 F.3d at 1150 (emphasis added). That a defendant felt he or she "had better confess or else" would clearly render the confession involuntary, because such a confession would not be "the product of the accused's free and rational choice." *See Jones*, 32 F.3d at 1516. This standard is markedly higher than the 'in custody' standard, which, where a formal arrest has not occurred, merely requires that there be a "restraint on freedom of movement of the degree associated with a formal arrest." *Thompson v. Keohane*, 516 U.S. 99, 112 (1995). Because the *Acosta* language, if treated as a new test, or evidentiary floor, rather than an explanation, would effectively require a showing of involuntary confession to establish custody, it clearly

cannot be treated as the standard for determining whether a suspect was in custody. The purpose of *Miranda* warnings under the Fifth Amendment is to "reduc[e] the risk that a coerced confession would be admitted," *Missouri v. Seibert*, 542 U.S. 600, 617 (2004) (Kennedy, J., concurring), even when that confession does not rise to level of being 'involuntary.'

### 2. Conflation of Fourth and Fifth Amendment Analyses

The recommendation also erred in addressing the significance of Shine's handcuffing, by improperly conflating the Fourth Amendment issues of whether and for what reasons police had the lawful authority to handcuff Shine with the Fifth Amendment issue of whether Shine was 'in custody.'

One of the three original *Street* factors for determining whether a suspect is 'in custody' is whether the police touched the suspect. *Street*, 472 F.3d at 1309. In analyzing Shine's handcuffing, the

recommendation focuses on whether Officer Ritchie, under the Fourth Amendment, had the authority to handcuff Shine for a purpose other than arresting him. After laying out possible bases for Ritchie to believe that Shine posed a danger, the recommendation concludes: "[T]he court finds that Ritchie had an articulable and reasonable belief that handcuffs were reasonably needed to preserve the status quo and for officer safety. Therefore, Ritchie's use of handcuffs does not give rise to a conclusion that defendant's freedom of action was curtailed to a degree associated with formal arrest." R&R (doc. no. 55) at 29.

This analysis improperly conflates the Fourth Amendment issues of whether and for what reasons police had the lawful authority to handcuff Shine with the Fifth Amendment issue of whether Shine was 'in custody.' The Fourth Amendment prohibition on unreasonable searches and seizures, as well as its requirement of probable cause to place a suspect under arrest, concerns whether officers have sufficient

evidence to justify police actions. As a result, the test for when officers properly use handcuffs to detain a suspect focuses on, among other potential justifications, whether the officer reasonably believed the suspect posed a danger to officer safety. *See Gray ex rel. Alexander v. Bostic*, 458 F.3d 1295, 1305-06 (11th Cir. 2006). By contrast, the purpose of *Miranda* warnings under the Fifth Amendment is to "reduc[e] the risk that a coerced confession would be admitted," *Missouri v. Seibert*, 542 U.S. 600, 617 (2004) (Kennedy, J., concurring), even when that confession does not rise to level of being 'involuntary.' Accordingly, the 'in custody' inquiry is based on whether a reasonable innocent person in the *suspect's position* would have perceived a "restraint on [his or her] freedom of movement of the degree associated with a formal arrest." *Street*, 472 F.3d at 1309; *see also Yarborough v. Alvarado*, 541 U.S. 652, 662 (2004) ("[C]ustody must be determined based on how a reasonable person in the suspect's situation would perceive his

circumstances."); *Berkemer*, 468 U.S. at 421-22 ("[T]he only relevant inquiry is how a reasonable man in the suspect's position would have understood his situation."); *Newton*, 369 F.3d at 675 ("*Miranda*'s concern is not with the facts known to the law enforcement officers or the objective reasonableness of their actions in light of those facts. *Miranda*'s focus is on the facts known to the seized suspect and whether a reasonable person would have understood that his situation was comparable to a formal arrest."). In other words, whether Officer Ritchie reasonably believed that Shine posed a danger to officer safety and therefore was permitted under the Fourth Amendment to handcuff Shine is irrelevant to whether someone in Shine's position would have felt restrained to the extent of a formal arrest.

The recommendation therefore erred in analyzing the fact of Shine's handcuffing in terms of Ritchie's perceptions and permissible reasons for handcuffing under the Fourth Amendment, rather than in terms of the

perceived restraint from Shine's position, as the *Street* line of cases instructs. When properly viewed from Shine's perspective, the fact that he was handcuffed, placed against his vehicle and searched, questioned about possible drug activity, and then moved to the hood of the patrol car, all weigh strongly in favor of a custody finding.

## B. Second Interrogation

Having presumed that Shine was in custody during the first interrogation and that his non-*Mirand*ized statements during that interrogation should be suppressed, the court now turns to Shine's contention that his statements during the second interrogation, at the station house, should be suppressed under *Seibert*. For the following reasons, the court finds that the so-called "*Seibert* exception" does not apply and thus that the statements made during the second interrogation should not be suppressed.

## 1. Legal Standard

The Supreme Court in *Oregon v. Elstad*, 470 U.S. 298 (1985), held that a suspect who makes incriminating statements without first receiving required *Miranda* warnings may still later validly waive his or her *Miranda* rights and provide admissible statements after the government has provided *Miranda* warnings.  In that case, two police officers entered the home of Michael Elstad, an 18-year-old burglary suspect, with an arrest warrant.  *Elstad*, 470 U.S. at 300.  While one officer spoke to Elstad's mother in the kitchen, the other officer questioned Elstad in the living room without providing *Miranda* warnings; the government conceded that he was in custody during that time.  The officers then brought Elstad to the police station and, about one hour later, advised him of his *Miranda* rights, at which time Elstad made a written confession.  *Id.*

The Court held that the Fifth Amendment did not require exclusion of Elstad's post-warning confession, noting that "[o]nce warned, the suspect is free to

exercise his own volition in deciding whether or not to make a statement to authorities." *Id.* at 308. *Elstad* thus set out the general rule that a properly *Miranda*ized statement need not be excluded due to the existence of a prior improper, non-*Miranda*ized statement, because "[a] subsequent administration of *Miranda* warnings to a suspect who has given a voluntary but unwarned statement ordinarily should suffice to remove the conditions that precluded admission of the earlier statement." *Id.* at 314.

Later, in *Seibert*, the Court established a narrow exception to this rule, under which a second, post-warning confession should be suppressed as tainted by the earlier pre-warning statement. In that case, police had questioned the suspect extensively at the police station for between 30 to 40 minutes without providing *Miranda* warnings; after she confessed, she was given a 20-minute coffee break; when she returned, the police turned on a tape recorder, provided *Miranda* warnings, and confronted her with her pre-warning

statements. *Id.* at 604-05 (plurality opinion). Confronted with the statements she had already made, she confessed again. The Court found that this "question-first" tactic undermined *Miranda* because its "manifest purpose" was "to get a confession the suspect would not make if he understood his rights at the outset"; "[u]pon hearing warnings only in the aftermath of interrogation and just after making a confession, a suspect would hardly think he had a genuine right to remain silent, let alone persist in so believing once the police began to lead him over the same ground again." *Id.* at 613.

While the plurality opinion would have applied an objective test to determine whether the *Miranda* warnings prior to a second questioning were effective in apprising the suspect of her rights--regardless of the intent of the police officers--Justice Kennedy's concurrence held that suppression is necessary "only in the infrequent case ..., in which the two-step interrogation technique [is] used in a calculated way

to undermine the *Miranda* warning." *Id.* at 622 (Kennedy, J., concurring). Even where such a deliberate strategy is employed, however, a post-warning statement could be admissible if the officers took appropriate "curative steps," such as "a substantial break in time and circumstances" between the two interrogations, or "an additional warning that explains the likely inadmissibility of the prewarning custodial statement." *Id.*

Because Justice Kennedy's concurrence relied on a narrower ground, his opinion is controlling. *Street*, 472 F.3d at 1313-14. Moreover, in deciding whether police officers employed a deliberate two-step interrogation strategy, this court must still consider "the totality of the circumstances including the timing, setting, and completeness of the pre-warning interrogation, the continuity of police personnel and the overlapping content of the pre- and post-warning statements." *Id.* at 1314 (internal quotation marks omitted).

## 2. Application

Shine argues that his statements during interrogation at the police station should be suppressed under the 'Seibert exception,' because his first, non-Mirandized questioning during the first investigation undermined the effectiveness of subsequent Miranda warnings. Shine's briefing on this issue relies largely on the fact of the two separate interrogations to suggest that the police employed a deliberate two-step strategy. At oral argument, Shine also emphasized the fact that Officer Pendley apparently telephoned Agent Ioimo prior to arrival at the station house and provided information that he and Officer Ritchie had received from Shine. The government responds that there is no evidence of such a strategy here, and that Elstad controls.

At the evidentiary hearing held by this court, Officer Ritchie stated that the Montgomery Police Department (MPD) has a policy that police officers on the scene do not decide whether to arrest suspects on a

felony charge. Instead, the officers are to gather information and notify a detective or other supervisor, who then decides whether to further detain or arrest the suspect on felony charges. Ritchie further suggested that the fact that he did not provide *Miranda* warnings to Shine while gathering information was consistent with that policy--that is, under the policy, officers do not typically administer *Miranda* warnings prior to the decision of supervisors to arrest or further detain a suspect.

The court agrees with the recommendation that there is not sufficient evidence that the officers here used a "two-step interrogation technique ... in a calculated way to undermine the *Miranda* warning," *Seibert*, 542 U.S. at 622 (Kennedy, J., concurring), and that the general *Elstad* rule governs this case.

Looking at the totality of the circumstances, *Street*, 472 F.3d at 1314, the court finds insufficient evidence of a deliberate two-step process. In terms of timing, as much as 90 minutes elapsed between the two

interrogations--from the end of the dash-camera footage at 4:41 p.m. to the beginning of Agent Ioimo's interview at 6:10 p.m.--and there is no evidence that Shine was questioned during that gap.

The setting of the two interrogations also weighs in the government's favor. The questioning in *Seibert* all took place at the station house, suggesting a certain amount of continuity between the two interactions. Here, the first interrogation occurred at the roadside, while the second interrogation occurred after Shine was taken into the police station. The change in personnel between the first interrogation and the second also weighs in favor of the government. *See id*.

The "completeness of the prewarning interrogation," *id.*, by contrast, weighs in Shine's favor. During the first interrogation, Ritchie asked Shine repeatedly about the digital scale, the gun, his drug use, whether he sells drugs, and where he obtains drugs. When Ritchie was not satisfied with Shine's answers, he

continued to prod and varied his interrogation tactics. Although this questioning was not as complete as Agent Ioimo's, it was extensive. This factor therefore weighs in Shine's favor, although not dispositively so.

Finally, the "content of the pre- and post-warning statements" is particularly unhelpful for Shine. *Id*. Agent Ioimo testified that he received information from Officers Pendley and Ritchie prior to his interrogation of Shine. During the police station interrogation, Ioimo at times confronts Shine with these facts, such as the presence of a digital scale and razor blade in his truck's console. However, as the recommendation observed, "it is difficult to imagine a situation in which the detaining officer would share no information with a taskforce officer or other officer who is charged with interviewing a suspect." R&R at 38-39. Importantly, the facts the interrogator used were gathered through the officers' observations during the traffic stop and not from any confession elicited from Shine during pre-warning interrogation. The use in a

second interrogation of a few facts that were obtained through officer observation--and not through prior interrogation of the defendant--do not tend to show the existence of a deliberate two-step strategy as employed in *Seibert*.

The court was troubled to some extent by Officer Ritchie's testimony regarding the MPD's policy of gathering information from potential suspects without providing *Miranda* warnings. Such preliminary fact gathering and communication with supervisors plays an understandable role in police investigations and in deciding whether to arrest a suspect. However, it raises a potential problem under *Seibert* in circumstances where subjects are in police 'custody' under *Miranda* during the initial fact-gathering. That is, when preliminary fact-gathering slides into the realm of custodial interrogation, the MPD policy of withholding *Miranda* warnings in the initial police encounter *could* begin to look like the "two-step" or "question-first" strategy rejected in *Seibert*. In

other words, the policy cannot, consistent with the Fifth Amendment, be used as means to get around, or shield city officers from, *Miranda*'s requirements. Regardless as to policy, if a person is *in custody*, he is entitled to the *Miranda* warnings before questioning; *Miranda*, not the policy, dictates when the warnings must be given. However, there is simply not enough evidence in this case to demonstrate that this apparent MPD policy was created, or employed, in "a *calculated* way to undermine the *Miranda* warning." *Id.* at 622 (Kennedy, J., concurring) (emphasis added). In sum, Shine fails to establish that the officers here employed a deliberate "question-first" strategy to undermine the effectiveness of *Miranda* warnings during the second interrogation. Even with the court's presumption that Shine was in custody during the first, non-*Mirand*ized interrogation, the facts as to the second interrogation simply do not meet the requirements of the *Seibert* exception. Shine's

post-warning statements to Agent Ioimo will therefore
not be suppressed.


                           ***

     Upon an independent and de novo review of the
record in this case and upon consideration of the
recommendation of the magistrate judge, it is ORDERED
that:

     (1) The magistrate judge's recommendation (doc. no.
55) is accepted in part and rejected in part, as set
forth above.

     (2) Defendant Kendall Dewight Shine's supplemented
motion to suppress (doc. nos. 36, 32) is granted only
as to the period during the traffic stop after
defendant Shine was handcuffed and moved to the
officers' patrol car, and is denied in all other
respects.

     DONE, this the 5th day of January, 2018.

                      /s/ Myron H. Thompson
                     UNITED STATES DISTRICT JUDGE